JUDGE NORGLE

MAGISTRATE JUDGE VALDEZ

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**12 CR 836**

| UNITED STATES OF AMERICA | ) Violation: Title 7, United States |
| --- | --- |
| | ) Code, Section 6b(a)(2) and 13(a)(5) |
| v. | ) |
| | ) **INFORMATION** |
| JOSHUA T.J. RUSSO | ) |

FILED
OCT 25 2012
THOMAS G BRUTON
CLERK, U S DISTRICT COURT

The ACTING UNITED STATES ATTORNEY charges:

1. At times material to this information:

   a. Commodities were agricultural products, such as soybeans or corn; physical items, such as precious metals or heating oil; and financial instruments, such as foreign currencies or U.S. Treasury bills.

   b. Commodity futures contracts were standardized, legally binding agreements to buy or sell a specific product or financial instrument in the future. The buyer and seller of a futures contract agreed on a price for a product or financial instrument to be delivered or settled in cash on a future date. Subsequent movement in the market price for the particular product or financial instrument determined whether a profit or loss was made on the eventual purchase or sale of the contract.

   c. Commodity futures contracts were traded on contract markets, commonly known as exchanges and boards of trade, that were designated pursuant to the Commodity Exchange Act by the Commodity Futures Trading Commission, the federal agency established by statute to regulate transactions involving the purchase and sale of futures contracts. The Chicago Mercantile Exchange was one of these designated contract markets.

d.   Futures commission merchants, or FCMs, were brokerage firms that registered with the CFTC and accepted orders to buy and sell commodity futures contracts in accordance with the rules of an exchange. Individual investors could trade commodity futures on the trading floor of an exchange only through FCMs who were registered with the CFTC.

e.   Introducing brokers were investment firms that employed associated persons for the purpose of soliciting clients and helping them open brokerage accounts with FCMs. Associated persons also provided orders to commodity trading advisers and brokers to buy and sell commodity futures contracts on behalf of the clients whom they had referred to the FCMs.

f.   Individual investors opened different types of brokerage accounts that granted varying degrees of discretion to the brokers who placed trades in the accounts. One type of account was a self-directed account, where brokers placed trades only in response to specific orders made by the clients. Another type of account was a managed account, where brokers exercised broader discretion to place orders that were consistent with an investment strategy previously agreed upon by the clients.

g.   Olympus Futures, Inc. was an introducing broker located in Chicago, Illinois that was registered with the CFTC and assisted its clients with opening brokerage accounts with futures commission merchants, including Rosenthal Collins Group, LLC. Prior to November 1, 2009, Olympus Futures operated under the name of Peak Trading Group, a division of Rosenthal Collins Group, LLC.

h. Defendant JOSHUA T.J. RUSSO was an associated person of Olympus Futures and Peak Trading Group who served as one of Olympus Futures's vice presidents of alternative investments. Defendant RUSSO's job duties included soliciting prospective clients for commodity pool investments, managed accounts, and other investments, ensuring that trades were placed by Rosenthal Collins Group, LLC on behalf of his clients in a manner consistent with the clients' directions and investment strategies, and communicating with his clients about the value of their investments. Defendant RUSSO received commissions for trades placed on behalf of his clients.

i. Commodity pools allowed multiple individual investors to combine their money and trade commodity futures contracts as one large, single entity. Investors purchased shares in the commodity pool, and the pool then invested the money in futures contracts. The shares owned by investors entitled them to a *pro rata* portion of any profits made by the commodity pool.

j. Peak Performance Fund was a commodity pool established by Peak Trading Group and Olympus Futures. Although the Fund was registered as a commodity pool from October 2007 through December 2009, it never accepted any money from investors, never invested any money on its own behalf, and never was traded in any contract market. The Fund withdrew its registration on or about December 17, 2009, meaning that it could not accept funds from investors after that date.

2. Beginning in March 2007 and continuing until on or about April 26, 2011, defendant JOSHUA T.J. RUSSO, in and in connection with orders to make, and the making of, contracts of sale of commodities for future delivery that were made for or on behalf of other persons, specifically, customers of Olympus Futures, other than and subject to the rules of a designated contract market, did willfully cheat and defraud, and attempt to cheat and defraud, customers of Olympus Futures of approximately $1,310,000, and did willfully make and cause to be made to customers of Olympus Futures false reports and statements.

3. Defendant JOSHUA T.J. RUSSO fraudulently obtained approximately $2,500,000 from investors in connection with the offer and sale of interests in a purported commodities fund and in managed account services by misrepresenting: (a) his prior performance investing in commodity futures; (b) the level of risk associated with commodity futures investments; (c) the existence and trading performance of the Peak Performance Fund; and (d) the uses of the funds obtained from investors. Defendant RUSSO concealed the fraud by creating and distributing to investors false and fraudulent e-mails, spreadsheets, account statements, and audit reports that substantially inflated the performance of the Peak Performance Fund and individual investors' accounts.

4. Defendant JOSHUA T.J. RUSSO falsely represented to Victim A that certain of Victim A's investment funds would be and were being used to purchase shares of the Peak Performance Fund. In fact, as defendant RUSSO knew, the Fund had never accepted individual investors and no money had ever been invested with the

Fund. For instance, in June 2007, defendant RUSSO advised Victim A that the Fund had traded wheat futures and that Victim A's shares in the Fund were worth approximately $497,980 when, in fact, the Fund had no assets and had made no trades. On another instance, in March 2009, defendant RUSSO advised Victim A that he had traded certain currencies through the Fund when, instead, defendant RUSSO misappropriated the invested funds to place other trades without Victim A's knowledge or consent. On another instance, in September 2009, defendant RUSSO advised Victim A that Olympus Futures was "willing to go above and beyond" to serve Victim A because he was "one of the first into [the Fund]" when, as defendant RUSSO knew, the Fund had never been funded and had never made any trades.

5. Defendant JOSHUA T.J. RUSSO falsely represented to Victim A that the Peak Performance Fund was a conservative investment that "hedged" or protected against the risks of the commodity futures market. In fact, defendant RUSSO misappropriated the monies that he misrepresented were in the Fund account to place speculative trades without the authorization of Victim A, including trades involving crude oil, natural gas, gold, silver, copper, corn, wheat, soybeans, lean hogs, cotton, foreign currencies, stock indices, and other commodity futures. Defendant RUSSO also failed to disclose that the trades that he made with Victim A's funds regularly lost money, including losses during approximately 32 out of the 48 months that Victim A's account was open, for a total loss of approximately $980,000 between April 2007 and April 2011.

6. Defendant JOSHUA T.J. RUSSO provided Victim A with false and fraudulent account statements and other documents showing that Victim A's investments, including those purportedly in the Fund, were highly profitable. In fact, as defendant RUSSO knew, trades based on the funds that Victim A invested through defendant RUSSO suffered substantial losses. The false and fraudulent documents that inflated the value of Victim A's investment portfolio included: (a) e-mails, charts, and spreadsheets prepared by defendant RUSSO; (b) accounting statements and audit reports forged by defendant RUSSO; and (c) statements of the Fund's financial condition forged by defendant RUSSO. For instance, in April 2011, defendant RUSSO provided e-mails to Victim A showing that his investment portfolio was worth approximately $3,062,000 when, in fact, it was worth approximately $420,000.

7. Defendant JOSHUA T.J. RUSSO encouraged and caused Victim A to use the false and fraudulent documents that defendant RUSSO created to recruit and refer friends and relatives, including Victims B, C, D, E, and F, to defendant RUSSO and RUSSO's introducing broker, Olympus Futures, for the purpose of investing additional funds in commodity futures trading accounts and opening additional managed accounts.

8. Defendant JOSHUA T.J. RUSSO falsely represented to Victims A, C, and E that he would invest and caused to be invested funds he received from them or on behalf of their spouses in investment products that "hedged" or protected them against the risks on the commodity futures market. In fact, defendant RUSSO repeatedly

made, and caused to be made, speculative trades without the victims' authorization in such commodities as crude oil, precious metals, and foreign currencies.

9. Defendant JOSHUA T.J. RUSSO provided Victims B, C, and D with false and fraudulent e-mails, spreadsheets, and other documents showing that their investments were highly profitable when, in fact, as defendant RUSSO knew, the investments consistently resulted in losses.

10. Defendant JOSHUA T.J. RUSSO concealed and hid, and caused to be concealed and hidden, the purposes of the acts done to fraudulently obtain funds from investors.

11. As a result, defendant JOSHUA T.J. RUSSO fraudulently obtained approximately $2,500,000 from at least six investors and caused losses of approximately $1,310,000, including approximately $208,000 in commissions for defendant RUSSO, which defendant RUSSO spent for personal purposes such as gambling, vacations, clothing, theater tickets, meals, and entertainment.

12. On or about March 9, 2011, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOSHUA T.J. RUSSO,

defendant herein, in connection with an order to make, and the making of, a contract of sale of a commodity for future delivery, namely, July 2011 silver futures, that was made for and on behalf of another person, namely, Victim A, other than and subject to the rules of a designated contract market, did willfully cheat and defraud, and attempt

to cheat and defraud Victim A, and did willfully make and cause to be made to Victim A a false report and statement;

In violation of Title 7, United States Code, Sections 6b(a)(2)(A) and (B) and 13(a)(5).

 

                                                  *Gary S. Shapiro by JBP*
                                                  ACTING UNITED STATES ATTORNEY